# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br> )<br> )<br>v.                                 )<br> )<br> )<br>CLEMENT ALLARD and       )<br>JOSEPH MARCO CORBIN,      )<br> )<br>         Defendants.           ) | Crim. No. 07-11-B-W |

## RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

Defendants Allard and Corbin have each moved to suppress physical objects, identification evidence, statements, and other items of evidentiary significance discovered as the result of the stop of a tractor trailer truck on March 1, 2007, in Aroostook County, Maine. (Doc. Nos. 74 & 77.) I held an evidentiary hearing on the motions on August 15, 2007. I now recommend that the court adopt the following proposed findings of fact and deny the motions.

### *Proposed Findings of Fact*

Donald Ardell is a Special Agent with the Bureau of Immigration and Customs Enforcement ("ICE"), Department of Homeland Security, assigned to the Houlton, Maine, resident agency. He has been an employee of ICE, including his tenure with its predecessor agencies, since 1996. In October 2006 an unnamed, undisclosed source of information told Ardell that he knew of a Canadian tractor trailer truck driver who used his vehicle to smuggle marijuana into the United States from Canada through the Van Buren, Maine, Port of Entry. According to the informant, the tractor trailer had a

trapdoor in its box trailer behind which was located a hidden compartment used to conceal marijuana. The informant described the tractor trailer as an owner operated green vehicle with yellow, orange and red stripes. The tractor trailer was used to carry sawdust or wood chips to a facility in Ashland, Maine. After dumping its loads, the tractor trailer would proceed to a roadside location where the owner operator would meet with the informant who would receive large duffel bags full of marijuana from the operator of the vehicle. The source of information said he met the tractor trailer two or three times per week during 2006, until late September of 2006. He described the owner operator as a Canadian male in his 40's or 50's, tall and skinny, with a full white beard. The first time the source of information met the tractor trailer owner operator a man identified as "Marco" was with him.

On October 23, 2006, an ICE agent[1] was reviewing digital video footage of the Van Buren Port of Entry and he identified a 2004 Peterbilt green tractor trailer with red, orange, and yellow stripes, bearing New Brunswick license plate PSI 573 and towing a trailer bearing New Brunswick license plate TGX 361. Homeland Security Department records revealed the tractor trailer was owned by and registered to Clement Allard, DOB

---

[1] This fact is taken from paragraph two of the affidavit in support of the complaint. In his memorandum, Allard states:
> In paragraph 2 of the affidavit, Ardell relates that "[o]n October 23, 2006, ICE S/A Peter Wolczik reviewed digital video footage of the Van Buren Port of Entry . . ." and identified two or more tractor trailer rigs as matching that described by S1. In the same paragraph Ardell states that a check of records revealed that one of the tractor trailers was owned and registered to Clement Allard, the defendant.

(Allard Mem. at 2). As both Allard and Corbin reference this fact, it probably exists somewhere in the record. My suspicion is that the information may be in the search warrant affidavit relating to the cell phone, but those documents are not part of the record of this hearing or filed with this case. I cannot find the information about two or more rigs matching the description in that paragraph of the complaint affidavit and there was no testimony on this issue at the hearing so I have omitted that fact from these proposed findings of fact. If that fact is established somewhere in this record, I do not believe it changes the analysis at all. The significant fact is that it is Allard's rig that was being monitored from October to March, not some other rig.

08/28/1956, of 272 Route 265, Kedgwick River, New Brunswick E8B1R3.  The record revealed numerous border crossings by the tractor trailer truck and the trailer between January 2006 and October 2006.  As of early October 2006 Clement Allard did not have a full white beard nor does he have white hair color on his fully visible head hair.  (Def's. Ex. #4, government surveillance photos dated 10-04-2006).

After Ardell learned of Allard's identity he placed an automated lookout into the Treasury Enforcement Communications System which would notify him immediately whenever the tractor trailer truck or Clement Allard entered the country.  From October 2006 until March 1, 2007, Ardell received alerts on three occasions that the vehicle and/or Allard had entered the country.   There is no information that anything untoward happened on the first occasion the vehicle entered the country.

On February 28, 2007, Ardell received notification that the vehicle was again in the United States.  He conducted surveillance of the tractor trailer dumping its load of sawdust or wood chips at the Boralex plant in Ashland, Maine.  On that same date Ardell participated in the surveillance of the activities of an undercover agent for ICE, Special Agent Kenneth Cogan.[2]  Cogan met with Joseph Corbin and another co-conspirator at a location in northern Maine.  Cogan presented himself as a person prepared to deliver marijuana to customers in Massachusetts and elsewhere.  The three men and another unnamed person participated in a conversation during which the plan to move marijuana was discussed.  Corbin indicated the marijuana would be concealed in hockey bags and there would be approximately 50 pounds in each bag.  The co-conspirator and Corbin told Cogan to take two hockey bags to a location in Holyoke, Massachusetts, and bring

---

[2] The conversation that Ardell overheard was in both English and French.  He did have the aid of another law enforcement officer, the chief of police from Madawaska, who speaks French and was able to provide a contemporaneous rough translation of the entire conversation.

3

payment for the marijuana back to northern Maine. Cogan was given driving instructions to Holyoke and told the marijuana would be smuggled into the United States and he would have to pick it up in Ashland, Maine. The co-conspirator told Cogan that "our guy" takes his truck to a mill in Ashland in the evening and dumps his load and then would meet Cogan afterward to deliver the marijuana. Corbin said they would provide Cogan with a Toyota Tacoma pick-up truck with Massachusetts license plates and a Tonneau cover to do the deliveries. The co-conspirator told Cogan that if he were apprehended by law enforcement he would not be expected to pay for the marijuana that was seized, as long as he produced a ticket or summons to prove that he had really been charged with possessing the marijuana. The co-conspirator also told Cogan he would be provided with a cellular telephone to communicate with the person to whom he was to deliver the marijuana. Corbin and his associate indicated the pickup truck would be delivered by another person but they were concerned about using him to transport the marijuana because he had long hair and did not look right. They were also concerned because this person had taken his wife and two children with him to Massachusetts to retrieve the pickup truck. Cogan indicated he could not deliver the marijuana to Massachusetts the following day, March 1, because he was going on vacation with his family. The co-conspirator indicated they might use the fellow who was delivering the Toyota Tacoma for one marijuana run but they were interested in using Cogan upon his return from vacation.

      On March 1, 2007, at approximately 4:32 p.m., Ardell received notification from ICE that the tractor trailer truck had again entered the United States from Canada. Based upon the prior information the truck was placed under surveillance and Ardell observed it

dump its load of wood chips at the Boralex plant. The tractor trailer then went to a convenience store in Ashland, Maine, and parked next to a dark green Toyota Tacoma pickup truck with a bed cover[3] that had been waiting at the convenience store. Two male occupants got out of the pickup truck and met with the sole male occupant of the tractor trailer truck. One male occupant, later identified as Randy St. Jarre, returned to the pickup truck, opened the rear tail gate, looked inside, closed the tailgate, and got into the passenger side door of the vehicle. The second male who had been in the pickup, later identified as Joseph Marco Corbin, got into the passenger side of the tractor trailer truck, while an individual later identified as Clement Allard got into the driver's side. Ardell then followed the two vehicles as they drove out of town.

      Approximately ten miles from the convenience store, Ardell observed the tractor trailer truck and the pickup truck pull to the side of Route 167 in Mapleton, Maine, and shut off their head lights. Other surveillance vehicles traveling with Ardell proceeded past the tractor trailer and pickup truck, but Ardell pulled to the side of the road and maintained surveillance of the suspect vehicles. He observed Clement Allard and one of the other individuals moving about at the side and rear of the tractor trailer truck. Between the darkness and the glare of the side running lights on the tractor trailer, Ardell was unable to observe what the men did. Thereafter, the pickup truck departed and approximately four minutes later the tractor trailer departed. A short distance away two Maine State Troopers stopped the pickup truck. The troopers indicated the pickup was

---

[3]     The affidavit in support of the complaint does not indicate the vehicle had Massachusetts plates and there was no testimony on this issue. I have therefore omitted that fact. However, the Government's summary of the evidence, quoted in the discussion portion of this recommended decision references the Massachusetts plates. The police reports, filed with Defendant Allard's motion (Doc. No. 77, Ex. 1) indicate the truck came from Massachusetts. As with the assertion about two or more tractor trailers matching the description, there is probably not much dispute about this fact. And even if the fact is disputed, my analysis would not change.

5

operated by a female and occupied by Randy St. Jarre and two minor children. The female operator consented to a search of the pickup truck and St. Jarre admitted there was marijuana in the bed of the truck and likewise consented to the search of the truck. The troopers opened the tailgate of the truck and found two large hockey bags. The trooper's narcotics canaine alerted to the presence of narcotics on the bags and the bags were subsequently found to contain 108 pounds of marijuana.

    While these events were unfolding at the pickup truck, a short distance away Ardell and other agents stopped the tractor trailer truck. Allard was identified as the operator and Corbin was his passenger. The two men were ordered out of the vehicle. Allard indicated he was coming back from dropping off wood chips. Allard consented to a search of the vehicle, but a brief search revealed nothing of evidentiary value. The men were detained by the roadside for approximately ten minutes and then Ardell learned that marijuana had been found in the pickup truck, whereupon Allard and Corbin were arrested.

    In a post-arrest confession St. Jarre told Allard that he and Corbin had spoken on February 25, 2007, about the plans to smuggle marijuana into the United States. He received a call in the early morning of March 1, 2007, and was told "it was a go." Corbin came to his residence and said they should go to Ashland, Maine, before nightfall. The female who drove the pickup truck was the only one with a valid driver's license; Corbin and the two minor children rode in the backseat. They arrived at the convenience store and met the tractor trailer there. Corbin said he was going to ride in the tractor trailer with his "buddy" and they followed the tractor trailer for approximately ten miles until it pulled over to the side of the road. St. Jarre got out of the pickup truck and Corbin and

Allard then placed two hockey bags into the bed of the pickup truck. St. Jarre then returned to the pickup truck and they all drove away. St. Jarre had intended to take the marijuana to Madawaska, park the pickup in his girlfriend's driveway and leave the keys in the truck. He had been instructed to do so during a telephone conversation with an older man earlier in the morning. St. Jarre was to be paid $1,000.00 upon delivery of the marijuana to the house and he was told the payment would be left in the mailbox.

The police seized and searched the tractor trailer as a result of these events. They did discover a "hidden" compartment and a drill bit they contend was used to loosen the screws to remove the cover form the "hidden" compartment. Ardell also obtained search warrants and searched the cell phones of the individuals arrested that night. As part of their motions to suppress Allard and Corbin maintain that these items must be suppressed because they flow from the illegal investigatory stop of the tractor trailer.

*Discussion*

The legal underpinnings of these motions to suppress are fairly straightforward. An informant's tip can provide the basis for probable cause if the informant can provide detailed facts that can be independently verified by police. Probable cause to search exists where there is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Consistent with the Fourth Amendment, law enforcement agents may stop a moving automobile to investigate their *reasonable suspicion* that the vehicle's occupants were, are, or will be engaged in criminal activity." United States v. Kimball, 25 F.3d 1, 6 (citations omitted) (emphasis in original). "To initially justify a Terry stop, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" Id. The totality of the circumstances that

7

confronted the agents at the time of the stop must be taken into consideration. Id. A passenger has standing to object to the illegal seizure of a vehicle and seek to suppress evidence seized as fruit of the poisonous tree. Id. Neither the Government nor the defendants disagree with these basic legal propositions and all parties cite basically the same legal authority in support of their positions.

  This case boils down to a question of whether the glass was half full or half empty. The defendants strenuously maintain that whatever reasonable and articulable suspicion law enforcement had in October 2006 to stop a Canadian tractor trailer rig making runs to a mill in Northern Maine had dissipated by the time of the stop on the first of March. They point to the fact that the unnamed informant was incorrect about a number of facts. There was no man with a full white beard. The tractor trailer did not come into the United States two or three times a week as the informant said it had been doing prior to September 2006. When the officers maintained surveillance of the tractor trailer in question on two of the three occasions that it did come into the country between October and March, nothing untoward appeared to be happening. In essence, the defendants maintain that whatever the confidential informant told the police, its value had dissipated to *nil* by March 1 because some of the facts had been disproven. The defendants maintain that even when the vehicle was followed on March 1, the law enforcement officers did not actually see any transfer take place and therefore their stop was not justified.

  On the other side of equation, the Government puts forth the following facts as justifying a reasonable and articulable suspicion sufficient to justify the stop of the tractor trailer:

Here, at the time of the stop of the tractor trailer truck Corbin was traveling in, the agents knew the following:

> S1 had been meeting a tractor trailer driver and receiving loads of marijuana for several months during 2006;
> S1 stated the driver would deliver wood chips to a plant in Ashland and, after dumping the chips, meet S1 on a deserted stretch of road to deliver the marijuana;
>
> S1 stated that the marijuana would be concealed in a hidden compartment in the trailer being hauled by the truck;
>
> S1 had provided a physical description of the truck and the trailer that had been transporting the marijuana;
>
> ICE was able to identify defendant Allard and his 2004 Peterbilt truck and trailer as fitting the physical description provided by S1 and confirmed that defendant Allard used the truck to bring wood chips to a plant in Ashland during the same period of time described by S1;
>
> ICE was able to identify the 2007 Peterbilt truck being operated by Allard and confirm that it was hauling the same trailer as he had previously hauled with the 2004 Peterbilt;
>
> S/A Cogan had met with two Canadian marijuana smugglers (one who was subsequently identified as Corbin) the day before who told him that "their guy" would dump his load at a mill in Ashland, Maine, and then deliver the marijuana to a runner;
>
> Corbin and the other Canadian smuggler had sent a "long haired hippy" to pick up a Toyota Tacoma pick up truck, with Massachusetts license plates and a tonneau cover, for use in the smuggling operation;
>
> Corbin and the other Canadian smuggler were concerned about using this subject because he did not look right and because he had taken his wife and two kids with him to retrieve the pick up truck;
>
> When told that S/A Cogan might not be able to make a run until he returned from vacation the following week, Corbin and the other Canadian smuggler stated that they might ask the guy who was retrieving the pick up truck make the run;
>
> S/A Ardell learned that Allard and had entered the country with his tractor trailer truck on March 1, 2007;

9

>Allard was observed dumping a load of wood chips at the Boralex plant in Ashland, Maine;
>
>Allard was observed meeting with an occupant of the Toyota Tacoma pickup truck with Massachusetts license plates after dumping his wood chips;
>
>S/A Ardell observed that the occupant, subsequently identified as St. Jarre, had long hair;
>
>S/A Ardell observed a woman and two children in the pickup truck;
>
>Allard's tractor trailer truck and the Toyota Tacoma pick up truck were observed meeting on a deserted stretch of road outside Ashland minutes later;
>
>S/A Ardell observed movement at the rear of the trailer, where the door to the trailer is located.

(Gov't. Mem. at 6-7).

In my view, the Government has the better argument here. The officers had independently, through careful police investigation, corroborated a number of the facts provided to them by the confidential informant. The arrival on the scene of the Toyota Tacoma pickup truck provided the necessary link to justify the stop of the tractor trailer. Allard and Corbin were only detained for approximately ten minutes before the marijuana was located in the pickup truck and once that marijuana had been discovered, their arrest was based on probable cause. After observing the suspicious activity by the side of the road on a deserted stretch of highway, the officers would have been remiss in their duty had they not stopped the truck to at least investigate what had transpired. The stop was clearly based on a reasonable and articulable suspicion and the Government has neatly summarized the basis of that suspicion.

### *Conclusion*

Based upon the foregoing I recommend the court deny both defendants' motions to suppress.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 17, 2007